UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR WATER SECURITY
AND COOPERATION,

*Plaintiff*,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY,

*Defendant*.

Civil Action No. 23 - 2529 (LLA)

**MEMORANDUM OPINION**

The Center for Water Security and Cooperation ("CWSC") brought this action against the Environmental Protection Agency ("EPA" or "Agency") alleging violations of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. CWSC claims that the EPA unlawfully withheld records relating to the Agency's enforcement of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* After resolving most of the disputes in this matter, the parties have now filed cross-motions for summary judgment. For the reasons explained below, the court will grant the EPA's motion for summary judgment and deny CWSC's cross-motion for summary judgment.

### I.     FACTUAL BACKGROUND

When municipal discharges into bodies of water run afoul of the Clean Water Act, the EPA tries to bring the municipality into compliance "as soon as practicable." Off. of Water, U.S. Env't Prot. Agency, *Proposed 2022 Clean Water Act Financial Capability Assessment Guidance*

("Guidance") at 5 (Feb. 2022), https://perma.cc/5D49-TFRN.[1]  To determine how long the compliance process should take, the EPA considers a variety of factors. *Id.*  For example, the EPA uses a Financial Capability Assessment ("FCA") to evaluate "a community's financial capability as a part of negotiating implementation schedules under . . . enforcement agreements." *Id.*  These analyses "provide an important benchmark for EPA decision-makers to consider in [Clean Water Act] permitting and enforcement actions to support consistency across the country." *Id.* at 7.  Since 1997, the EPA has used FCAs "to support consent decree negotiations with over 100 wastewater utilities throughout the United States and U.S. territories." *Id.*  Relevant to this litigation, the EPA secured at least seven consent decrees between 2017 and 2020 against municipalities accused of violating the Clean Water Act ("Consent Decree Cases").  *See United States v. City of Corpus Christi*, No. 20-CV-235 (S.D. Tex. 2020); *United States v. City of Hattiesburg*, No. 20-CV-158 (S.D. Miss. 2020); *United States v. City of Manchester*, No. 20-CV-762 (D.N.H. 2020); *United States v. City of Houston*, No. 18-CV-3368 (S.D. Tex. 2019); *United States v. City of Meridian*, No. 19-CV-427 (S.D. Miss. 2019); *United States v. City of Middletown*, No. 18-CV-90 (S.D. Ohio 2018); *United States v. Sanitary District of Hammond*, No. 17-CV-48 (N.D. Ind. 2017).

In February 2022, the EPA proposed updated guidance concerning its use of FCAs in enforcing provisions of the Clean Water Act.  *See generally* Guidance.  Two months later, CWSC—"an independent, non-partisan and not-for-profit corporation" that "seeks to . . . guarantee water security and universal access to water and sanitation around the world," ECF No. 1

---

[1] The court may take judicial notice "of public records and government documents available from reliable sources." *United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 56 n.2 (D.D.C. 2018) (quoting *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016)).

¶ 19—submitted a FOIA request for information related to the Agency's use of FCAs, ECF No. 32-1 ¶ 1; ECF No. 33-1, at 1.[2]  Specifically, CWSC requested two categories of documents:

> (a) "any and all Financial Capability Assessments analyses and any other relevant analyses, reports, reviews, or additional assessments performed or created that were used to inform or determine the implementation schedule and deadlines for implementing control measures or completing projects under the consent decree and Long Term Control Plans" for the "seven consent decrees" issued in the [Consent Decree Cases, and]
>
> (b) "any and all written reports, analyses, or other assessments of FCA 'consistency' and 'benchmark[ing].'"

ECF No. 32-1 ¶ 2; *see* ECF No. 33-1, at 1-2, 34-37.  In September 2022, the EPA partially denied the FOIA request by invoking FOIA Exemptions 5, 6, and 7(a).  ECF No. 33-1, at 6, 39-42; ECF No. 35-1 ¶ 2.

The EPA thereafter provided CWSC with several responsive documents and multiple *Vaughn* Indices explaining its withholdings.  ECF No. 33-1, at 6, 22; ECF No. 35-1 ¶¶ 3-4.  At the end of December 2022, CWSC appealed the EPA's FOIA decision.  ECF No. 33-1, at 18-104.  In January 2023, the EPA partially granted the appeal but largely upheld the Agency's invocation of various FOIA Exemptions.  ECF No. 32-3, at 24-27.

## II.   PROCEDURAL HISTORY

In August 2023, CWSC filed this action against the EPA seeking to compel the EPA to conduct a more thorough search and disclose all responsive records (and portions of records) being withheld under FOIA.  ECF No. 1, at 12.  The parties met and conferred and filed a series of status reports updating the court on their efforts to narrow the case.  *See* ECF Nos. 19 to 21, 23, 24, 26

---

[2] Citations to ECF No. 33-1 refer to the ECF-generated page numbers, rather than the document's internal pagination.

to 30.  During that time, the EPA made additional productions of previously withheld records and provided information to contextualize its other withholdings.  ECF No. 32-3 ¶ 26.  Eventually, the parties whittled their dispute down to 179 records that were released with redactions and 119 records that were withheld in full under FOIA Exemption 5.  *Id.*; ECF No. 30 ¶ 2.  Unable to further resolve their disagreements, the EPA filed a motion for summary judgment in December 2024 and argued that it (1) had conducted an adequate search for records; (2) had properly withheld records under FOIA Exemption 5; and (3) had properly segregated non-exempt information for disclosure.  ECF No. 32.  CWSC filed a cross-motion for summary judgment in January 2025.  ECF No. 33.  Both motions are now fully briefed.  ECF Nos. 32, 33, 35, 38.

In the process of briefing summary judgment, the parties further narrowed the scope of their disputes.  First, while CWSC originally sought responsive records for both parts of its original FOIA request, *see supra* Part I, it later agreed to withdraw its request for the first category of documents, *see* ECF No. 38, at 1 ("Records regarding the first part of the FOIA Request are no longer at issue.").  Second, CWSC abandoned its challenge to the adequacy of the EPA's search.  *Compare* ECF No. 33, at 8-9, *with* ECF No. 38.  Third, CWSC dropped its claim that the EPA's *Vaughn* Index was insufficiently detailed, particularly with respect to authorship, recipient, and confidentiality information.  *Compare* ECF No. 33, at 9-17, *with* ECF No. 38.

### III.   LEGAL STANDARD

"[T]he vast majority of FOIA cases can be resolved on summary judgment."  *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  Summary judgment may be awarded to the agency if it can demonstrate that no material facts are in dispute, that it conducted an adequate search for responsive records, and that each record has either been produced or is exempt from disclosure.  *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 59 F. Supp. 3d

4

184, 189 (D.D.C. 2014). The agency invoking a FOIA exemption bears the burden of demonstrating that it applies. *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). This burden is met when agency affidavits or declarations "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). The agency may also carry its burden "by providing the requester with a *Vaughn* index, which must adequately describe each withheld document, state which exemption the agency claims for each withheld document, and explain the exemption's relevance." *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 774 (D.C. Cir. 2002).

  Even where the requested information falls comfortably within a FOIA exemption, the agency must still demonstrate that disclosure would result in foreseeable harm. 5 U.S.C. § 552(a)(8). To satisfy this burden, the agency must "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021) (alteration in original) (quoting H.R. Rep. No. 114-391, at 9 (2016)). The agency must come up with more than "'generalized assertions'" or "'speculative or abstract fears'" of harm. *Id.* (first quoting *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020), then quoting S. Rep. No. 114-4, at 4 (2015)). Instead, it "must provide 'a focused and concrete demonstration of why disclosure of the particular type of material . . . will, in the specific context of the agency action at issue, actually impede' the interests protected by a FOIA

exemption." *Leopold v. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024) (quoting *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370).

## IV.   DISCUSSION

Thanks to the parties' good-faith efforts to narrow the scope of this litigation—which the court greatly appreciates—the only remaining issue is the EPA's continued withholding, pursuant to FOIA Exemption 5's deliberative-process privilege, of information in three "Communities Documents": ED_006876A_00000023, ED_006876A_00000097, and ED_006876A_00000105. *See* ECF No. 38, at 1-2; ECF No. 32-3, at 113, 148, 150.  These documents are spreadsheets containing information about different demographic entities and were part of an EPA effort to analyze "how the results of a draft FCA Guidance . . . would apply to a cross-section of communities."  ECF No. 32-3, at 113, 148, 150.[3]  CWSC argues that the EPA may not withhold purely factual information within the Communities Documents pursuant to the deliberative-process privilege.  ECF No. 38, at 2-7.  The EPA counters that such information is not segregable because it "is inextricably intertwined with [substantial] analysis [of draft policy options]," and because disclosure would result in foreseeable harm.  ECF No. 35, at 13-16.  The court agrees with the EPA.

### A.   Deliberative-Process Privilege

The deliberative-process privilege is designed to "enhance the quality of agency decisions" by shielding "'open and frank discussion[s]'" between government officials.  *Hardy v. Bureau of*

---

[3] Citations to this document refer to the ECF-generated page numbers, rather than the document's internal pagination.  The *Vaughn* Index entries for documents -097 and -105 indicate that they are spreadsheets, *see* ECF No. 32-3, at 148, 150, while the redacted version of document -023 clearly shows spreadsheet column headers, *id.* at 113.

6

*Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 165 (D.D.C. 2017) (quoting *Dep't of the Interior v. Klamanth Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001)); *see* 5 U.S.C. § 552(b)(5) (exempting the disclosure of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency"). The privilege protects "documents reflecting advisory opinions, recommendations[,] and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamanth Water*, 532 U.S. at 8 (quoting *Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).

To qualify for the privilege, an agency document must be both (1) "pre-decisional" and (2) "deliberative." *Hardy*, 243 F. Supp. 3d at 164 (quoting *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015)). "Documents are 'predecisional' if they are 'generated before the adoption of an agency policy,' and 'deliberative' if they 'reflect[] the give-and-take of the consultive process.'" *Id.* (alteration in original) (quoting *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017)). The government bears the burden of satisfying both components of the test. *See Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 616 (D.C. Cir. 1997).

Generally speaking, factual information is not protected by the deliberative-process privilege. *See Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) ("Under the deliberative process privilege, factual information generally must be disclosed, [while] materials embodying officials' opinions are ordinarily exempt."). But, in an effort to prevent over-disclosure and an excessive reliance on the factual/deliberative distinction, the D.C. Circuit has explained that "the legitimacy of withholding does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on

7

whether the selection or organization of facts is part of an agency's deliberative process." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011).  Put differently, factual information is still protected under the deliberative-process privilege if disclosing it "'bear[s] on the formulation or exercise of agency policy-oriented judgment'" or "if the factual information is 'inextricably intertwined with the deliberative sections of documents.'" *Hardy*, 243 F. Supp. 3d at 165 (emphasis omitted) (first quoting *Petroleum Info. Corp.*, 976 F.2d at 1435, then quoting *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)).

The parties agree that the Communities Documents contain both factual information and Agency analysis.  *See* ECF No. 32-3, at 113, 148, 150 (explaining that each document featured "analysis" and "real world data").  The parties primarily spar over the redaction of population data and similar statistics from thirty-eight communities across three spreadsheets.  *See* ECF No. 35, at 14.  The EPA asserts that these records are "composed of detailed analysis of a proposed [FCA] methodology under consideration," "applied real world data[,] and described the methodology . . . step by step along with analysis, highlighted challenges, and . . . recommendations to the workgroup."  ECF No. 35, at 13-14.  In its view, the facts and analysis go hand-in-hand and cannot be separated.  ECF No. 35, at 14-15.  CWSC, meanwhile, argues that purely factual information within the documents should be segregated and disclosed, even if other parts remain protected.  ECF No. 38, at 3-7.  The EPA has the better of the argument.

Agencies may not use Exemption 5 to "cloak [purely factual reports] in secrecy." *Reliant Energy Power Generation, Inc. v. Fed. Energy Regul. Comm'n*, 520 F. Supp. 2d 194, 205 (D.D.C. 2007) (quoting *Bristol-Myers Co. v. Fed. Trade Comm'n*, 424 F.2d 935, 939 (D.C. Cir. 1970)).  But the "'application of the deliberative process privilege is context-specific,'" meaning that it is "'dependent upon the individual document and the role it plays in the administrative

process.'" *Hardy*, 243 F. Supp. 3d at 168 (first quoting *Edmonds Inst. v. U.S. Dep't of the Interior*, 460 F. Supp. 2d 63, 70 (D.D.C. 2006), then quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980)).  While the disputed records contain factual information about numerous communities, their very inclusion in the documents "constitutes an exercise of judgment by [the] agency." *Reliant Energy*, 520 F. Supp. 2d at 203 (quoting *Montrose Chem. Corp. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974)); *see Am. Petroleum Tankers Parent, LLC v. United States*, 952 F. Supp. 2d 252, 269-70 (D.D.C. 2013) (explaining that the "culling" of data "in essence creat[es] new information as part of the deliberative process").  As the EPA's declarant explains, the Agency's "staff selected the communities used in this analysis based on the availability of data associated with the communities that would be useful to the analysis[,] not because the community was the target of an ongoing or contemplated enforcement action." ECF No. 35-2 ¶ 5.  When it comes to choosing data, the "work of . . . separating the wheat from the chaff is surely just as much part of the deliberative process as is the later milling by running the grist through the mind of the administrator." *McKinley v. Fed. Deposit Ins. Corp.*, 744 F. Supp. 2d 128, 140 (D.D.C. 2010) (quoting *Montrose Chem.*, 491 F.2d at 71).  For this reason, "even if the data plugged into the [analysis] is itself purely factual, the selection and calibration of data is part of the deliberative process to which Exemption 5 applies." *Goodrich Corp. v. U.S. Env't Prot. Agency*, 593 F. Supp. 2d 184, 189 (D.D.C. 2009).[4]

---

[4] The parties also debate whether the factual information in the Communities Documents can be segregated.  *See* ECF No. 35, at 17-18; ECF No. 38, at 3-7.  But because it is the *selection* of the data that is deliberative, disclosing the data itself would reveal aspects of the EPA's decision process.  *See McKinley*, 744 F. Supp. 2d at 140 (explaining that "disclosing the withheld factual material would reveal the [agency]'s deliberative process" because "culling . . . statistics . . . from the mass of data available to [the agency] is itself deliberative" (quoted source omitted)).  As a result, the raw data is protected by the deliberative-process privilege.

9

In addition to the deliberative nature of *selecting* data, the disputed information also played a key role in the EPA's substantive, deliberative process.  The Agency included the selected communities' data so that it could further develop and refine the implementation of FCAs.  According to the *Vaughn* Index entries, EPA staff were "analyzing how the results of a draft FCA Guidance"—in other words, an in-progress proposal—"would apply to a cross-section of communities . . . to better understand" how that policy would function in the real world.  ECF No. 32-3, at 113, 148, 150.  Using the data in the Communities Documents to test policy outcomes enabled the EPA to "refine" the version of the Guidance that "would ultimately be published for notice and comment."  *Id.*  The data thus played a key role in how the EPA formulated significant policy choices, placing it squarely within the ambit of Exemption 5.

Where, as here, an agency has to "make decisions about how to look at the data, how to select portions of the data to examine, and how to interpret the data," the deliberative-process privilege shields the underlying facts.  *Reliant Energy*, 520 F. Supp. 2d at 206 (quoted source omitted).  The information about various communities within the contested records "serve[d] primarily to reveal the 'evaluative' process by which different members of the decisionmaking chain arrived at their conclusions."  *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 575 F.2d 932, 935 (D.C. Cir. 1978) (quoting *Wash. Rsch. Project, Inc. v. Dep't of Health, Educ. & Welfare*, 504 F.2d 238, 250 (D.C. Cir. 1974)).  For these reasons, the deliberative-process privilege shields the contents of the Communities Documents.

### B.     Foreseeable Harm

Even though the Communities Documents fit within the protections of a FOIA exemption, the EPA must still show that disclosure would cause foreseeable harm.  5 U.S.C. § 552(a)(8).  "In the [specific] context of withholdings made under the deliberative process privilege, the

foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369-70 (quoting *Machado Amadis*, 971 F.3d at 371).

Here, the EPA's attestations—both in the *Vaughn* Index and in the declarations provided by Joseph Theis, Acting Director of the EPA's Water Enforcement Division—satisfy this standard. Each *Vaughn* entry for the Communities Documents explains that disclosure "would impair [the] EPA's ability to candidly assess options prior to making decisions regarding permitting and enforcement policy." ECF No. 32-3, at 113, 148, 150. If the EPA is unable to confidentially select and test actual data, that would "discourage experimentation" and make it more difficult for the Agency to complete realistic assessments of possible enforcement policy. *Id.* Mr. Theis further elaborates that disclosing the source of the test data "would suggest that [the] EPA has a view of a given community's financial capability, compliance with the Clean Water Act, or an expectation of how the community would respond to an enforcement action when none of those potential inferences . . . would . . . be accurate." ECF No. 35-2 ¶ 5. Divulging this information would "damage [the] EPA's relationship with the community and the states to which these communities belong." *Id.* To avoid future confusion, the EPA's staff would likely have to resort to using "dummy data" rather than real-world data, thus inhibiting the Agency's ability to acquire realistic, useful results in its testing. *Id.* These explanations constitute a "focused and concrete demonstration of why disclosure . . . , in the specific context of the agency action at issue, actually impede[s] . . . agency deliberations going forward." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370. Accordingly, the EPA has met its burden of demonstrating foreseeable harm.

## V. CONCLUSION

For the foregoing reasons, the court will grant the EPA's motion for summary judgment, ECF No. 32, and deny CWSC's cross-motion for summary judgment, ECF No. 33. A contemporaneous order will issue.

LOREN L. ALIKHAN
United States District Judge

Date:   August 12, 2025